# IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF SOUTH CAROLINA
### ANDERSON/GREENWOOD DIVISION

| | | |
|---|---|---|
| Beattie B. Ashmore, *in his capacity as* | ) | |
| *court-appointed receiver for Ronnie Gene* | ) | Civil Action No.: 8:15-cv-00561-JMC |
| *Wilson and Atlantic Bullion and Coin, Inc.*, | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | **ORDER AND OPINION** |
| | ) | |
| Jim Dodds, | ) | |
| | ) | |
| Defendant. | ) | |
| _____ | ) | |

Plaintiff Beattie B. Ashmore ("the Receiver"), in his capacity as court-appointed receiver for Ronnie Gene Wilson ("Wilson") and Atlantic Bullion and Coin, Inc. ("AB&C"), filed the instant action against Defendant Jim Dodds ("Defendant") to recover grossly excessive payments received by Defendant as a return on his investment in the Wilson-AB&C Ponzi scheme.[1] Before the court are the parties' cross-motions for summary judgment (ECF Nos. 70, 71) and the accompanying responses and replies (ECF Nos. 73, 74, 77, 79). For the reasons that follow, the court **DENIES IN PART** Defendant's motion for summary judgment (ECF No. 71), disposing of seven arguments he raises in support of a ruling in his favor. As explained more thoroughly below,

---

[1] "A Ponzi scheme is a fraudulent investment program in which funds are paid in by investors and later investors['] funds are used to pay out nonexistent phantom profits to the original investors, thus creating the illusion that the fraudulent investment program is a successful, profit generating enterprise which, in turn attracts new investment funds that are used to sustain the fraudulent program." *United States v. Wilson*, No. 8:12-cr-00320-JMC, ECF No. 1-1 at 2 ¶ 6 (D.S.C. Apr. 4, 2012). In *Wilson*, the United States alleged that Wilson, through AB&C, "orchestrated a Ponzi scheme whereby he led investors to believe that he was investing their money in silver, when, in fact, Wilson was not buying silver but using the money for his personal gain . . . [and] [t]o keep the Ponzi scheme going, Wilson also made payments to earlier investors to whom Wilson made representations that their investments were earning high rates of return–sometimes in excess of 200 percent." *Id.*, ECF No. 17 at 1.

the court determines that it should certify to the Supreme Court of South Carolina questions regarding whether the substantive law of Florida or of South Carolina should apply to the claims brought by the Receiver. As a result, the court reserves ruling on the remainder of Defendant's motion and on the Receiver's motion for summary judgment until after the Supreme Court answers or otherwise disposes of the certified questions.

## I. RELEVANT FACTUAL AND PROCEDURAL BACKGROUND

A full recitation of the relevant factual and procedural background, customary for most orders addressing summary judgment motions, is unnecessary. Accordingly, the court provides an abridged version of the general posture of this matter here and provides further details where necessary in its analysis below.

The Receiver is the court appointed receiver in *In Re: Receiver for Ronnie Gene Wilson and Atlantic Bullion & Coin, Inc.*, No. 8:12-cv-02078-JMC, ECF No. 1 (D.S.C. July 25, 2012), a case related to the instant matter. The Receiver alleges that "[o]n February 29, 1996, Defendant made an initial 'investment' [in the Wilson-AB&C Ponzi scheme] of $28,300.00." (ECF No. 1 ¶ 24.) "Subsequently, Defendant made eight additional 'investments' totaling $306,500.00 between December 2000 and April 2009, for a total investment of $334,800.00." (*Id.* ¶ 27.) Plaintiff further alleges that "Defendant received $1,532,983.00 in returns [from the Wilson-AB&C Ponzi scheme] between March 2004 and December 2011, resulting in a profit of $1,198,183.00." (*Id.* ¶ 26.)

Based on his appointment as the receiver tasked with "locating, managing, recouping, and distributing the assets of the Wilson-AB&C investment scheme," the Receiver commenced the instant action against Defendant on February 6, 2015, asserting claims for fraudulent conveyance (in violation of the Statute of Elizabeth, S.C. Code Ann. § 27-23-10 (2014) and/or the Florida

Uniform Fraudulent Transfer Act ("FUFTA"), Fla. Stat. Ann. §§ 726.101–726.201) and unjust enrichment. (ECF No. 1 ¶¶ 1, 38-52.)

Pursuant to the court's fifth amended scheduling order, absent an exception described in the order, discovery was to be completed by April 25, 2017, and motions for summary judgment were to be filed by May 15, 2017. (*See* ECF No. 67 at 1.) On May 19, 2017, the parties filed their motions for summary judgment.[2] As relevant here, the Receiver argues that, under South Carolina choice of law rules, South Carolina law applies to both his claim for fraudulent conveyance and his claim for unjust enrichment and that Florida law does not apply to these claims (*see* ECF No. 73 at 6-9; *see also* ECF No. 70 at 6-12 (applying only South Carolina law to claims)) while Defendant argues that, under South Carolina choice of law rules, Florida law governs both claims and that South Carolina law is inapplicable (*see* ECF No. 71 at 6-8; ECF No. 74 at 4; ECF No. 77 at 3-5). Also relevant here, the court perceives in Defendant's arguments seven issues that may be decided without first deciding the choice of law issue.

## II. LEGAL STANDARD

Summary judgment is appropriate when the materials in the record show that "there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). A dispute is genuine "if the evidence is such that a reasonable jury could

---

[2] In his motion, Defendant also seeks dismissal, pursuant to Fed. R. Civ. P. 12(b)(6), of the Receiver's fraudulent conveyance claim under FUFTA on the ground that the complaint fails to plead sufficient factual matter to state a facially plausible claim for relief under FUFTA. (*See* ECF No. 71 at 3-6.) In response, the Receiver argues that a Rule 12(b)(6) motion to dismiss is untimely and that the motion is otherwise meritless. (*See* ECF No. 73 at 4-6.) Because the court determines that it will certify a question to the South Carolina Supreme Court as to whether Florida law applies to the Receiver's fraudulent conveyance claim, the court declines at this stage to address the Rule 12(b)(6) aspect of Defendant's motion.

return a verdict for the nonmoving party," and a fact is material if it "might affect the outcome of the suit under the governing law." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986).

When faced with cross-motions for summary judgment, "'[courts] consider each motion separately on its own merits to determine whether either of the parties deserves judgment as a matter of law.'" *Defenders of Wildlife v. N.C. Dep't of Transp.*, 762 F.3d 374, 392 (4th Cir. 2014) (quoting *Bacon v. City of Richmond*, 475 F.3d 633, 638 (4th Cir. 2007)). "In considering each motion, [courts] 'resolve all factual disputes and any competing, rational inferences in the light most favorable to the party opposing that motion.'" *Id.* (quoting *Rossignol v. Voorhaar*, 316 F.3d 516, 523 (4th Cir. 2003)).

The party seeking summary judgment shoulders the initial burden of demonstrating to the court that there is no genuine issue of material fact. *See Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986). Once the movant has made this threshold demonstration, the non-moving party, to survive the motion for summary judgment, may not rest on the allegations averred in his pleadings. Rather, the non-moving party must demonstrate that specific, material facts exist which give rise to a genuine issue. *See id.* at 324.

### III. ANALYSIS

#### A. Preliminary Issues

Before turning to the two claims at issue, the court must first address a number of arguments raised by Defendant that do not appear to be specifically directed at either of the claims or that the court believes are appropriate to address preliminarily for other reasons. Specifically, Defendant argues that the court should rule in his favor because (1) the Receiver lacks standing to bring the claims; (2) the Receiver's claims are barred because the Receiver is *in pari delicto* with Defendant; (3) the Receiver's claims are barred because other investors in the Ponzi scheme are *in*

*pari delicto* with Defendant; (4) the Receiver should be equitably estopped from pursuing his claims; (5) the recovery the Receiver seeks should be denied because Defendant is protected by the Bankruptcy Code's safe harbor provisions in 11 U.S.C. § 546(e); (6) Defendant is entitled to an equitable set-off with respect to investments he made prior to Wilson commencing his Ponzi scheme; and (7) there is no evidence that Defendant received a certain check from AB&C. (*See* ECF No. 71 at 2-6, 9-11, 13-16, 20-23, 28-29; ECF No. 74 at 6-7, 17-26, 30-31; ECF No. 77 at 2-3, 6, 9-10, 13-15.) The court addresses each of these arguments in turn.

1. Standing

The Fourth Circuit has concisely explained both the constitutional and the prudential dimensions of standing:

> The standing doctrine has both constitutional and prudential components. In order to satisfy the constitutional component of standing, a party must meet three requirements:
>
> > (1) the party has suffered an injury in fact that is (a) concrete and particularized and (b) actual or imminent, not conjectural or hypothetical; (2) the injury is fairly traceable to the challenged action of the defendant; and (3) it is likely, as opposed to merely speculative, that the injury will be redressed by a favorable decision.
>
> With regard to the prudential component of standing, courts generally recognize [some] self-imposed constraints[, including that] . . . the plaintiff generally must assert his own legal rights and interests, and cannot rest his claim to relief on the legal rights or interests of third parties.

*Bishop v. Bartlett*, 575 F.3d 419, 423 (4th Cir. 2009) (internal citations, quotation marks, and brackets omitted) (citing, *inter alia*, *Friends of the Earth, Inc. v. Laidlaw Envtl. Servs. (TOC), Inc.*, 528 U.S. 167 (2000); *Allen v. Wright*, 468 U.S. 737 (1984); *Valley Forge Christian Coll. v. Ams. United for Separation of Church & State, Inc.*, 454 U.S. 464 (1982); *Warth*, 422 U.S. 490). "In determining whether a party has standing to bring suit, the party invoking the jurisdiction of the

court bears the burden of establishing standing." *Id.* at 424. "The standing requirement applies to each claim that a plaintiff seeks to press." *Bostic v. Schaefer*, 760 F.3d 352, 370 (4th Cir. 2014) (citing *DaimlerChrysler Corp. v. Cuno*, 547 U.S. 332, 352 (2006)).

Defendant appears to assert that the Receiver lacks standing to bring the two claims at issue because, in Defendant's view, the Receiver has capacity to bring suit only to recover assets on behalf of AB&C, Wilson, and the Receivership Entities they controlled. (*See* ECF No. 71 at 2-3, 20-21; ECF No. 74 at 6-7, 30; ECF No. 77 at 6, 11.) The assets that the Receiver seeks to claw-back by bringing the two claims, Defendant argues, never belonged to AB&C, Wilson, or the Receivership Entities because all assets held by AB&C were held in trust for investors and were never assets owned by AB&C, Wilson, or the Receivership Entities. (*See* ECF No. 71 at 2-3, 20-21; ECF No. 74 at 6-7, 30; ECF No. 77 at 6, 11.) Thus, Defendant asserts, the claims by the Receiver to recover assets must be brought, if at all, by the investors and cannot be brought by the Receiver, who may only bring claims on behalf of AB&C, Wilson, and the Receivership Entities. (*See* ECF No. 71 at 2-3, 20-21; ECF No. 74 at 6-7, 30; ECF No. 77 at 6, 11.) In other words, Defendant asserts that the Receiver lacks standing to bring the claims. (*See* ECF No. 71 at 2.)

In response (*see* ECF No. 79 at 3), the Receiver points out that, in a related case, this court already determined that he had standing, noting that "multiple federal courts of appeals and district courts have held that 'a federal equity receiver has standing to assert the claims of a receivership entity against third-party recipients of the entity's assets that have been fraudulently transferred by the principal of the Ponzi scheme,'" *Ashmore v. Owens*, No. 8:15-cv-02373-JMC, ECF No. 62 at 4 (D.S.C. June 2, 2017) (brackets and ellipsis omitted) (quoting *Janvey v. Democratic Senatorial Campaign Comm., Inc.*, 712 F.3d 185, 191 (5th Cir. 2013) (collecting cases)). The Receiver also

disputes Defendant's characterization of the assets at issue, asserting that the monies given by investors for the purchase of silver became assets of AB&C. (*See* ECF No. 79 at 3.)

The court notes that Defendant's arguments regarding standing are not entirely clear. First, it is not clear whether his arguments are directed to both the fraudulent conveyance and unjust enrichment claims or to only the fraudulent conveyance claim. To the extent it is necessary to address the Receiver's standing to bring both claims in his complaint, the court's analysis below applies to both. Second, it is not clear whether Defendant argues that the Receiver has failed to demonstrate an injury in fact (an element of constitutional standing) or that he has only asserted legal claims of third parties (a matter of prudential standing) or instead asserts some amalgamation of these arguments. Accordingly, the court's analysis addresses both these arguments.

The court begins its analysis by looking to *Scholes v. Lehmann*, 56 F.3d 750 (7th Cir. 1995), the Seventh Circuit's leading case on standing issues raised in circumstances like those in play here. In *Scholes*, a Ponzi schemer, Michael Douglas, created three corporations, caused the corporations to create limited partnerships, and then caused the corporations to sell interests in the partnerships to investors. *Id.* at 752. In reality, the monies given by the investors in exchange for an interest in the partnerships were not used for the business for which the partnerships were ostensibly created but, instead, were used by Douglas to run a Ponzi scheme. *Id.* In a later civil enforcement action, the district court appointed a receiver on behalf on both Douglas and the three corporations. *Id.* When the receiver brought fraudulent conveyance actions against winning investors, they argued that he was attempting to bring a claim on behalf of the losing investors but lacked standing to do so and that he could not bring a claim on behalf of Douglas and the three corporations because they were the perpetrators, not the victims, of the Ponzi scheme. *Id.* at 753-54.

The Seventh Circuit began by noting the baseline principle that "an equity receiver may sue only to redress injuries to the entity in receivership." *Id.* at 753 (citing, *inter alia*, *Caplin v. Marine Midland Grace Trust Co.*, 406 U.S. 416 (1972)). The Seventh Circuit then pointed out that the three corporations the receiver represented, which were legal entities separate from Douglas, sustained injuries when Douglas caused them to take money that "should have been used for the stated purpose of the corporations[]" and instead conveyed the money to further the ends of Douglas' Ponzi scheme. *Id.* at 754. As a result, Douglas "removed assets from the corporations for an unauthorized purpose and by doing so injured the corporations," and the investors became "tort creditors of the corporations from which they had been inveigled into buying limited-partner interests." *Id.* Once Douglas was removed from the picture, the corporations were "[f]reed from his spell" and "became entitled to the return of the moneys—for the benefit not of Douglas but of innocent investors—that Douglas had made the corporations divert to unauthorized purposes." *Id.* (citing, *inter alia*, *McCandless v. Furlaud*, 296 U.S. 140, 159-61 (1935); *Texas & Pacific Ry. v. Pottorff*, 291 U.S. 245, 260-61 (1934)). "That the return would benefit the limited partners is just to say that anything that helps a corporation helps those who have claims against its assets." *Id.*

Assuming that the Receiver is correct that the assets that were allegedly wrongfully transferred to, and retained by, Defendant were assets belonging to AB&C, then the Receiver, who brings this action on behalf of AB&C, has standing under the theory espoused in *Scholes*. AB&C was harmed when Wilson caused its assets to be used in his Ponzi scheme rather than to be used for the legitimate business purpose for which AB&C had been created, and the Receiver has standing to claw-back funds that were wrongfully diverted by Wilson. That the ultimate purpose of the action is to benefit losing investors in the Ponzi scheme (who are tort creditors of AB&C) has no impact on the Receiver's standing. This view—that a federal equity receiver representing a

corporate entity used to perpetrate a Ponzi scheme has standing to bring claims against third-party recipients of the entity's assets that were wrongfully transferred by the Ponzi scheme's principal—has been accepted by a number of the federal courts of appeals, *see Janvey*, 712 F.3d at 191 n.4 (collecting cases), by a district court within the Fourth Circuit, *see Bell v. Disner*, No. 3:14cv91, 2014 WL 6978690, at *5 (W.D.N.C. Dec. 9, 2014), and has been viewed favorably by both South Carolina courts, *see Myatt v. RHBT Fin. Corp.*, 635 S.E.2d 545, 547-48 (S.C. 2006), and Florida courts, *see Freeman v. Dean Witter Reynolds, Inc.*, 865 So. 2d 543, 550-53 (Fla. Dist. Ct. App. 2003).

As explained above, however, Defendant attempts to distinguish *Scholes* on the ground that the assets that are alleged to have been wrongfully transferred to, and retained by, Defendant were not the assets of AB&C. Defendant points out that, in *Scholes*, the assets appear to have belonged to the three corporations that Douglas used to perpetrate his Ponzi scheme, as the investors paid the monies at issue to the corporations in exchange for interests in the partnerships that were owned by the corporations. Here, on the other hand, Defendant argues, the investors caught up in Wilson's Ponzi scheme provided AB&C their assets to hold in trust, and the assets never became the property of AB&C because the parties agreed that AB&C would make investments on behalf of the investors using assets that remained the investors' property. (*See* ECF No. 74 at 7.) In Defendant's view, the fact that the assets alleged to have been wrongfully transferred and retained never belonged to AB&C precludes the Receiver from asserting that he is bringing claims to recover AB&C's assets, because he is, instead, bringing claims to recover assets that always belonged to the investors. (*Id.* (citing *Fleming v. Lind-Waldock & Co.*, 922 F.2d 20, 22 (1st Cir. 1990)).)

Assuming, without deciding, that Defendant's characterization of the assets at issue—that they were assets owned by the investors and not by AB&C—is correct, the court nevertheless concludes that the Receiver has standing to assert the claims in his complaint. At first blush, Defendant's argument seems appealing. After all, if the theory underlying *Scholes*' approach is that a receiver may seek recovery for an injury to the corporate entity and if the injury of which the receiver complains is a wrongful transfer and retention of assets, then its seems natural to assume that the receiver would seek the recovery of the corporate entity's assets and not some third party's assets. However, this assumption overlooks the fact that a corporate entity in which investors have deposited their assets (without transferring an ownership interest in the assets) not only incurs legal obligations to the investors (whether as a trustee, fiduciary, bailee, or otherwise) with respect to the assets but also obtains legal rights with respect to the assets as against third parties. When a Ponzi scheme principal, such as Wilson, causes AB&C to wrongfully divert the assets by paying off winning investors, the corporate entity, here AB&C, is injured in two ways: (1) it is exposed to liability for wrongfully transferring losing investors' assets to a winning investor because doing so deprived the losing investors of their assets and their opportunity to otherwise invest those assets, and (2) it is deprived of its non-ownership rights, including its rights to use the assets in a legitimate way in the business for which it was created, a use that might have generated profits in the form of fees or commissions. *See Marion v. TDI Inc.*, 591 F.3d 137, 148-49 (3d Cir. 2010). These injuries are fairly traceable to Defendant, a winning investor to whom transfers were made, because, once he was made aware of the wrongful nature of those transfers and of his retention of the assets, he failed to return them. *See Wuliger v. Mfrs. Life Ins. Co.*, 567 F.3d 787, 794-95 (6th Cir. 2009). And the injuries can be redressed by a court order to return the assets to the Receiver who represents AB&C and who will distribute the assets back to the losing

investors as AB&C's tort creditors. *See id.* at 795. In seeking such an order, the Receiver would be asserting AB&C's rights and not the rights of the losing investors, notwithstanding the Receiver's express purpose of benefitting the losing investors. *See id.*

The court notes that other courts have had no trouble applying *Scholes*' approach where, as here, the principal Ponzi schemer represents to investors that their assets will be invested into some commodity, account, or other investment vehicle, such that the investors ostensibly retain ownership interest in the assets they deliver to the corporate entity the schemer uses. *See Wiand v. Lee*, 753 F.3d 1194, 1197-99, 1202-03 (11th Cir. 2014); *Marion*, 591 F.3d at 141-43, 147-49; *Zayed v. Associated Bank, N.A.*, No. 13-232(DSD/JSM), 2015 WL 4635789, at *1-2, *5 (D. Minn. Aug, 4, 2015). The cases Defendant cites to support his view do not persuade the court that *Scholes*' approach should not apply here. Defendant cites *McCandless*, 296 U.S. 140, and *Scholes v. Ames*, 850 F. Supp. 707 (N.D. Ill. 1994), for the proposition that the Receiver may not bring claims on behalf of the investors, but, as explained above, the Receiver has brought the claims in this action on behalf of AB&C. Similarly, although the prohibition on a receiver's bringing claims on behalf of investors in *Fleming*, 922 F.2d 20, might be read to support Defendant's understanding of *Scholes*' approach, *Fleming* more clearly stands for the general proposition that a corporate entity's receiver may not bring claims on behalf of a corporate entity's investors, as that is precisely what the receiver in *Fleming* attempted to do. Because the court believes *Scholes*' approach is correct and applies here, the court concludes that the Receiver has standing to bring the claims in his complaint.

## 2. *In pari delicto* with the Receiver

Defendant next asserts that he is entitled to summary judgment on both claims because the Receiver is barred from bringing the claims under the doctrine of *in pari delicto*.[3] In the first iteration of this argument, Defendant asserts that the Receiver is bringing a claim on behalf of AB&C and that the claim should be barred, under the doctrine of *in pari delicto*, based on AB&C's own wrongful conduct. (*See* ECF No. 71 at 13; ECF No. 74 at 18; ECF No. 77 at 9.) Anticipating the Receiver's response, Defendant further asserts that the exception to an *in pari delicto* defense, the adverse interest exception—in which the wrongs committed by a principal's agent (here, Wilson) are not imputed to the principal (here, AB&C)—does not apply due to an exception to the exception in which an agent's wrongs are imputed to the principal when the agent is the sole actor or representative for a corporate principal. (ECF No. 71 at 13-14 (citing *In re Derivium Capital LLC*, 716 F.3d 355, 367 (4th Cir. 2013)).)

The court has already decided this matter. In a February 1, 2017 order (ECF No. 62)[4] addressing Defendant's motion to reconsider a previous order denying his motion to compel, the court expressly concluded that "*in pari delicto* does not bar the Receiver's claims in this action because he is not seeking tort damages, but has asserted claims of fraudulent conveyance and

---

[3] The common law doctrine of *in pari delicto* "derives from the Latin, *in pari delicto potior est conditio defendentis:* 'In a case of equal or mutual fault the position of the defending party is the better one.'" *Bateman Eichler, Hill Richards, Inc. v. Berner,* 472 U.S. 299, 306 (1985) (internal brackets and ellipsis omitted) (quoting Black's Law Dictionary 711 (5th ed. 1979)). The doctrine reflects the beliefs that "courts should not lend their good offices to mediating disputes among wrongdoers" and that "denying judicial relief to an admitted wrongdoer is an effective means of deterring illegality." *Id.* Thus, the defense "prohibits a party from recovering damages arising from misconduct for which the party bears responsibility" such that the relief that party seeks "will be denied," and "[t]he law will leave the parties just in the condition in which it finds them." 27A Am. Jur. 2d *Equity* § 103 (2017).

[4] The order may be found at *Ashmore v. Dodds*, No. 8:15-cv-00561-JMC, 2017 WL 427484 (D.S.C. Feb. 1, 2017).

unjust enrichment to obtain equitable relief for victims of the Wilson-AB&C Ponzi scheme from Defendant who is alleged to have profited from the illegal scheme" (*id.* at 8). In reaching this conclusion, the court determined that, under South Carolina law, an *in pari delicto* defense is inapplicable when a receiver seeks recovery of diverted funds wrongfully transferred in a Ponzi scheme by asserting claims for fraudulent conveyance and unjust enrichment rather than claims for tort damages. (*Id.* at 7-8 (citing *In re Worldwide Wholesale Lumber, Inc.*, 372 B.R. 796, 810 (Bankr. D.S.C. 2007); *Myatt*, 635 S.E.2d at 548).)

Although Defendant has previously moved for reconsideration of the court's decisions in these proceedings, he has failed to seek reconsideration of the court's ruling with respect to his *in pari delicto* defense. Defendant has not offered any reason for the court to reconsider its ruling, and no reason for which reconsideration of an interlocutory order may be granted appears in Defendant's arguments. *See In re Receiver*, No. 8:12-cv-02078-JMC, 2017 WL 2536913, at *2 (D.S.C. June 12, 2017) (citing *Carlson v. Bos. Sci. Corp.*, 856 F.3d 320, 325 (4th Cir. 2017); *Am. Canoe Ass'n v. Murphy Farms, Inc.*, 326 F.3d 505, 514-15 (4th Cir. 2003); *South Carolina v. United States*, ___ F. Supp. 3d ___, No. 1:16-cv-00391-JMC, 2017 WL 491694, at *4 (D.S.C. Feb. 7, 2017)). The court remains persuaded by its previous analysis that South Carolina law precludes an *in pari delicto* defense when a receiver for a corporate entity used in a Ponzi scheme seeks equitable recovery of diverted funds, rather than tort damages, regardless of whether the sole actor exception to the adverse interest exception would otherwise apply. Moreover, to the extent that Defendant asserts that he would be able to raise an *in pari delicto* defense to the fraudulent conveyance and unjust enrichment claims under Florida law, he is again precluded by the same rule that, in the context of a case such as this one, the doctrine of *in pari delicto* is inapplicable to claims seeking the recovery of diverted funds rather than claims seeking tort damages. *See In re*

*Skyway Comm'ns Holding Corp.*, 389 B.R. 801, 809 (Bankr. M.D. Fla. 2008) ("[U]nder Florida law, it appears that the defense may be asserted against common law tort claims, but not against statutory claims to recover fraudulent transfers."); *see also Iglesia Cristiana el Buen Samaritano, Inc. v. Guardian Servs., LLC*, No. 11-21888-civ, 2011 WL 5854640, at *5-6 (S.D. Fla. Nov. 21, 2011); *In re Wiand*, Nos. 8:05-cv-156-T-27MSS et al., 2007 WL 963165, at *6-7 (M.D. Fla. March 27, 2007).

Defendant lastly asserts that he should be permitted to raise the *in pari delicto* defense because either the fraudulent conveyance claim should be dismissed or else he should be granted summary judgment on the fraudulent conveyance claim. (*See* ECF No. 71 at 14-15.) Defendant appears to rely on the language in *Myatt* that indicates that its preclusion of the defense only applies "in the absence of a fraudulent conveyance case." 635 S.E.2d at 397. The court rejects this argument. First, as explained more fully below, the fraudulent conveyance claim has not been disposed, and, therefore, Defendant's argument, even if it were sound, would not warrant application of the *in pari delicto* defense at this stage. Second, and more fundamentally, the court concludes that Defendant's interpretation of *Myatt* is incorrect. As the court's previous order explained, in the court's view, *Myatt* precludes the defense when a receiver seeks the equitable recovery of wrongfully diverted funds, whether under a fraudulent conveyance claim or an unjust enrichment claim, instead of seeking damages in tort. The language in *Myatt* that Defendant cites appears to be the result of the *Myatt* court's interpretation of *Scholes* and *Knauer v. Jonathan Roberts Fin. Grp., Inc.*, 348 F.3d 230 (7th Cir. 2003), which did not involve unjust enrichment claims.

### 3. *In pari delicto* with investors

In the second iteration of Defendant's argument that he is entitled to summary judgment based on the doctrine of *in pari delicto*, Defendant asserts that he merely made the same mistakes as all other investors in the Wilson-AB&C Ponzi scheme, and that all investors are equally at fault in trusting Wilson with their investments. (*See* ECF No. 71 at 15-16; ECF No. 74 at 21-22; ECF No. 77 at 10.) Defendant explains that the doctrine of *in pari delicto* stands for the general rule that "where parties are . . . equally wrong, no affirmative relief will be given to one against the other and no one shall be permitted to profit by his own wrong." (ECF No. 71 at 15 (quoting *Proctor v. Whitlark & Whitlark, Inc.*, 778 S.E.2d 888, 893 (S.C. 2015) (citing *Whitelock v. Geiger*, 368 So. 2d 372, 374 (Fla. Dist. Ct. App. 1979) ("[W]hen both parties are *in pari delicto* the court will leave them to settle their disputes without aid of court.")).)

The Receiver responds that, "on its face, this argument is wholly without merit" (ECF No. 73 at 11), and the court agrees. The doctrine of *in pari delicto*, like the related doctrine of unclean hands, "prohibits a party from recovering damages arising from misconduct for which *the party* bears responsibility, bears fault, or which resulted from *his or her* wrongdoing." 27A Am. Jur. 2d *Equity* § 103 (2017) (emphasis added) (footnotes omitted); *see* 1 Am. Jur. 2d *Actions* § 40 (2017) ("The equitable defense of *in pari delicto* . . . is rooted in the common-law notion that a plaintiff's recovery may be barred by his or her own wrongful conduct."). Thus, these equitable defenses "require[] unconscionable, bad faith, or inequitable conduct *by the plaintiff* in connection with the matter in controversy." 27A Am. Jur. 2d *Equity* § 104 (emphasis added). Put another way, the doctrine "applies to facts involving only two parties, plaintiff and defendant, and one transaction involving both parties." *Id.* In the court's view, then, the doctrine of *in pari delicto* has no

application where the defendant asserts that some third party, and not the plaintiff seeking recovery for a wrong, was equally at fault with (or equally without fault as) the defendant for that wrong.

Here, as explained above, the Receiver brings his claims on behalf of AB&C and not the losing investors. Thus, for purposes of an *in pari delicto* defense, the relative culpability of other investors is irrelevant. Defendant has pointed to no authority supporting a position contrary to the one the court has taken and, thus, has not persuaded the court that it should exercise its equitable powers under the doctrine of *in pari delicto* to deny the Receiver relief on the ground that a non-party bears as much culpability as Defendant for any wrongs that occurred.

4. Equitable estoppel

Next, citing to both Florida and South Carolina law on the issue, Defendant argues that he is entitled to summary judgment on both claims because he has met the elements necessary for the court to equitably estop the Receiver from seeking recovery. (*See* ECF No. 71 at 22; ECF No. 74 at 17; ECF No. 77 at 13-14.) Defendant explains that Wilson represented to him that he would invest Defendant's money in silver, which turns out to have been a material misrepresentation, and later represented that the investment had turned a profit which, a part of which would be placed in Defendant's account; that Defendant reasonably relied on this representation, as Wilson had the appearance of operating a legitimate business; that Defendant had no reasonable means of knowing that Wilson's representations were false; and that Defendant had changed position, by investing his money with AB&C and withdrawing and spending the false profits, in reliance on the representations. (*See* ECF No. 71 at 22.)

As the court already pointed out, the Receiver has brought his claim only on behalf of AB&C and not on behalf of Wilson. All of Defendant's arguments are directed at equitably estopping Wilson from seeking recovery and are therefore inapplicable to the claims the Receiver

actually brings. Further, even assuming that Defendant could raise equitable estoppel, the burden is on Defendant to prove each element, *see Dozier v. Am. Red Cross*, 768 S.E.2d 222, 231 (S.C. Ct. App. 2014); *Goodwin v. Blu Murray Ins. Agency, Inc.*, 939 So. 2d 1098, 1104 (Fla. Dist. Ct. App. 2006), and the court would conclude that there remains a genuine dispute whether Defendant's reliance on Wilson's representations were justified and whether Defendant lacked a means of knowing that the representations were false. For these reasons, the court denies Defendant's motion for summary judgment in this respect.

5. Bankruptcy safe harbor provision

Next, Defendant argues that he is entitled to protection from the Receiver's claims under a safe harbor exception to a bankruptcy trustee's power to avoid and claw back certain securities-related payments made by the bankruptcy estate found in the Bankruptcy Code, 11 U.S.C. § 546(e). The court has no trouble rejecting this argument. In enacting the Bankruptcy Code, federal lawmakers decided to make § 546(e)'s safe harbor provision apply only to bankruptcy trustees, such that, unless bankruptcy proceedings have been initiated for AB&C, the Receiver is not barred from bringing avoidance actions under § 546(e). No bankruptcy trustee has been named here, and, thus, the Receiver is not barred.

In only one case does it appear that the safe harbor provision indirectly barred a party other than the trustee from pursuing a fraudulent conveyance claim. *See In re Tribune Co. Fraudulent Conveyance Litig.*, 818 F.3d 98 (2d Cir. 2016). Even in that case, which represents the most extravagant expansion of the safe harbor provision, the Second Circuit seems to have relied heavily on the fact that the non-trustee plaintiffs sought to avoid transfers made by a corporation for which a bankruptcy trustee had been appointed and for which bankruptcy proceedings were ongoing. *See id.* at 111 ("*Once a party enters bankruptcy*, the Bankruptcy Code constitutes a wholesale

preemption of state laws regarding creditors' rights." (emphasis added)) Thus, even accepting *arguendo* the Second Circuit's view of § 546(e), the court would still conclude that its safe harbor provision is inapplicable here.

6. Equitable set-off

Next, Defendant argues that, assuming the Receiver succeeds on one or both of his claims, Defendant is entitled to an equitable set-off. (*See* ECF No. 71 at 28-29; ECF No. 77 at 15.) Defendant explains that courts of equity liberally allow equitable set-off to prevent injustice where a party is unable to make out a claim for legal set-off. (*See* ECF No. 71 at 28-29 (citing *Epstein v. Epstein*, 915 So. 2d 1272, 1274 (Fla. Dist. Ct. App. 2005); *Carwile v. Metro. Life Ins. Co.*, 134 S.E. 275, 284 (S.C. 1926)); ECF No. 77 at 15 (citing *Okla. Dep't of Secs. ex rel. Faught v. Blair*, 231 P.3d 645 (Okla. 2010)).) Aside from this and similarly vague general principles underlying the doctrine of equitable set-off, Defendant provides no other legal analysis. Defendant asserts that Wilson admitted to commencing his Ponzi scheme in January 2001 but that, prior to that time, Wilson had already represented to Defendant that Wilson had purchased 11,300 ounces of silver under Defendant's account, which was worth $84,976 at the time Defendant made his first withdrawal from the account in March 2004. (ECF No. 71 at 28 (citing ECF Nos. 71-13, 71-15).) Based on this evidence, Defendant asserts he is entitled to a set-off in the amount of cash that he invested with AB&C, an amount that Defendant does not specify, and in "the amount of the increase of the value of silver that AB&C had purchased for him," again an amount that Defendant does not specify. (ECF No. 71 at 29.)

As a legal matter, the court concludes that Defendant has not shown that he is entitled to equitable set-off. As stated in the previous paragraph, Defendant does little more than cite the general rule that a court exercising equitable powers, such as this court, has the authority to permit

a set-off when doing so prevents injustice. This hardly demonstrates that Defendant is entitled to summary judgment on his equitable set-off claim as a matter of law. Under Florida law, it appears Defendant has not yet laid the groundwork for an equitable set-off. "Florida recognizes that to avail oneself of set-off in equity, the defendant must show an existing debt or demand against the complainant in favor of the defendant, and that the debt arose and existed under circumstances where disallowing it would be inequitable." *Wiand v. Dancing $, LLC*, 919 F. Supp. 2d 1296, 1317 (M.D. Fla. 2013) (citing *Durham Tropical Land Corp. v. Sun Garden Sales Co.*, 151 So. 327, 328 (Fla. 1932)), *rev'd on other grounds*, 578 F. App'x 938 (11th Cir. 2014); *see also Kearney v. Auto-Owners Ins. Co.*, No. 8:06-cv-595-T-24-TGW, 2007 WL 2298031, at *8 (M.D. Fla. Aug. 7, 2007) ("Florida cases hold[] that the principle of equitable set-off is limited to the situation where two parties each have a claim against the other" (citing *Everglade Cypress Co. v. Tunnicliffe*, 148 So. 192, 193 (Fla. 1932))). Defendant has not argued that he has some independent legal or equitable claim that he might assert against the Receiver *qua* AB&C; rather, it appears Defendant argues that the Receiver has failed to prove that the principal Defendant placed in his account with AB&C and the profits his account earned prior to the Ponzi scheme's commencement in January 2001 should be subject to the Receiver's fraudulent conveyance and unjust enrichment claims. Such an argument might be sound reason for denying the Receiver's motion for summary judgment on portions of his claims, but it offers no reason to grant summary judgment to Defendant on his claim for equitable set-off.[5]

---

[5] South Carolina law on equitable set-off is much less developed than its Florida counterpart, and the cases appear to simply repeat the same vague general principles on which Defendant relies. Assuming South Carolina law governs the equitable set-off claim Defendant raises, this paucity would, of course, excuse Defendant's undeveloped legal analysis.

Even assuming Defendant has provided an adequately developed legal analysis for an equitable set-off claim, the court would still conclude that the record makes summary judgment at this stage impossible. Although Defendant's argument appears to be that the Receiver has failed to show that the pre-2001 amounts in principal and profit in Defendant's AB&C account should be subject to the claims in the complaint, Defendant might instead be arguing that, assuming the pre-2001 principal and profits are subject to the Receiver's claims, then Defendant is entitled to an equitable set-off because that principal and those profits had no involvement with Wilson's Ponzi scheme. There are three factual problems with this argument. First, the Receiver is not seeking disgorgement of any of the principal amounts Defendant deposited into the AB&C account over the years but, instead, only the fictitious profits Wilson caused AB&C to pay Defendant above the principal amounts. (*See* ECF No. 70 at 2-3.) Thus, the court cannot conceive how equity requires a set-off for the principal amounts Defendant deposited in the account prior to 2001; those amounts are already not subject to the claims the Receiver asserts in his complaint. Providing Defendant a set-off for those amounts would be akin to double recovery, a result repugnant to equity.

Second, to the extent Defendant argues that he is entitled to an equitable set-off for profits, not principal, prior to 2001, the court notes that some authority supports a set-off for real profits (as opposed to fictitious profits) made before a corporation became a Ponzi schemer's utensil. Under FUFTA, for example, courts have held that there can be no equitable set-off for any fictitious profits, *see Wiand v. Cloud*, 919 F. Supp. 2d 1319, 1339-40 (M.D. Fla. 2013), implying that equitable set-off for real profits would be permitted. And, as Defendant points out, other jurisdictions have approved equitable set-offs for real profits when a winning investor's total profits are pursued by a receiver. *See Blair*, 231 P.3d 645. Here, however, the evidence to which

Defendant points demonstrates that AB&C did not transfer any profits to Defendant until March 2004, more than three years after the Ponzi scheme commenced, according to Wilson. No transfers were made to Defendant prior to 2001; thus, there are no transfers of purely real profit, and the only transfers that can be avoided necessarily include, at least in part, fictitious profit. Defendant has provided the court no means of separating out the real profit from the fictitious profit in any of the transfers subject to the Receiver's complaint. The court would deny summary judgment on this basis.

Third, it is not clear that Defendant made any real profit prior to 2001. Assuming that Wilson only began to use AB&C for his Ponzi scheme beginning in 2001, the record reflects the following trade transactions on the account prior to 2001: in February 1996, AB&C purchased 5,000 ounces of silver on Defendant's account for $28,300 at a price of $5.66 per ounce and sold the same amount for $29,300 in January of 1997 at a price of $5.86 per ounce. (ECF No. 17-13 at 2.) AB&C made two more purchases: 6,300 ounces in July 1997 at $4.65 per ounce and 5,000 ounces December 2000 at $4.70 per ounce, for a total purchase price of $52,795. (*Id.*) AB&C did not sell Defendant's silver again until September 2001, after the Ponzi scheme commenced, when the 11,300 ounces were sold for $54,805. (*Id.*) With these facts, how should Defendant's "profits" be determined? If one refers to amounts received in accounts controlled by Defendant, then he made no profits prior to 2001. If one refers to gains realized on the AB&C account from a sale before 2001, then the only profits Defendant made prior to 2001 amount to $1,000. If one refers to all gains realized on the account from sales of all silver purchased prior to 2001, then Defendant only made $3,010 in profits. If one refers to the amount of the increase of the value of silver that AB&C had purchased, as Defendant does, the amount is indeterminate at this stage. The conjectural nature of the existence and extent of real profits leads the court to conclude that

summary judgment on Defendant's claim for equitable set-off is simply premature *See Kearney*, 2007 WL 2298031, at \*8 n.6.

### 7. Evidence of receipt of a certain check

As the last preliminary issue, Defendant seeks partial summary judgment that he did not receive from AB&C a March 20, 2004 check in the amount of $55,986 that is listed as a withdrawal in Defendant's account statement from AB&C. (*See* ECF No. 71 at 29; ECF No. 71-13 at 1.) Defendant asserts that the only evidence on record that he received the check is a copy of the account statement and, because the Receiver's claims are premised on the assertion that the account statement is false, there is no evidence in the record on which the Receiver can rely to show that Defendant received the check. (*See* ECF No. 71 at 29.) In response, the Receiver first points to Defendant's deposition. (*See* ECF No. 73 at 19 (citing ECF No. 73-3 at 5).) At his deposition, upon being presented with the account statement, Defendant testified that he had no reason to challenge, and could not disagree with, any of the payouts to Defendant reflected in the account statement. (*See* ECF No. 73-3 at 5.) The Receiver asserts that he has produced further evidence that Defendant received the check in question. (*See* ECF No. 73 at 19.) The Receiver explains that around the time he filed his reply he submitted to Defendant in a supplemental discovery production a copy of the check. (*See id.* (citing ECF No. 73-4).) In reply, Defendant does not address the Receiver's arguments regarding Defendant's deposition testimony. Regarding the recently produced copy of the check, however, Defendant asserts that he "is troubled by the fact that the Receiver has produced new evidence on May 24, 2017, after the discovery deadline had passed." (ECF No. 77 at 4 n.4.)

As the parties have not adequately addressed the matter, the court declines to decide whether it is proper to consider the lately produced copy of the check. The court need not do so

now in any event because the evidence on record is sufficient to dispose of Defendant's request for partial summary judgment. Defendant argues that the Receiver cannot rely on the account statement because the Receiver's claims are premised on the account statement's falsity. That is only half-true. The Receiver's claims are that the purchases and sales of silver listed on the account statements are false, but the Receiver could hardly bring claims for fraudulent conveyance and unjust enrichment if his theory of liability was that the payouts listed on the account statement were also false. The court sees no reason why the Receiver could not rely on the account statement as evidence that AB&C paid to Defendant a $55,986 withdrawal on March 20, 2004. A reasonable inference, which here must be drawn in the Receiver's favor, is that, when Defendant made a withdrawal and AB&C paid it, Defendant received that payment. If the account statement itself were not enough—and it is enough—Defendant's deposition testimony provides further corroborative evidence that he received the check. Because, at a minimum, the Receiver has produced sufficient evidence to raise a genuine dispute of fact as to whether Defendant received the payment, the court must deny Defendant's request for partial summary judgment.

## B. Fraudulent Conveyance

Before assessing the parties' motions with respect to the fraudulent conveyance claim, the court must first determine the substantive law to apply to that claim. As an initial matter, both parties assert that, because the court is exercising its diversity jurisdiction over state law claims, it is obligated to apply the choice of law rules of South Carolina, the state in which it is situated. (*See* ECF No. 74 at 4 (citing *Klaxon v. Stentor*, 313 U.S. 487, 496 (1941)); ECF No. 73 at 6 (citing *Michelin N. Am., Inc. v. Inter City Tire & Auto Ctr., Inc.*, Nos. 6:13-2752-HMH; 6:14-1254-HMH, 2018 WL 12843916, at *3 (D.S.C. Jan. 20, 2015) (citing *Klaxon*, 313 U.S. at 496-97)).) In fact, although the court is adjudicating state law claims, the court's authority to adjudicate is grounded

on its supplemental or ancillary jurisdiction to decide matters over which it had federal question jurisdiction, rather than directly on its diversity jurisdiction. (*See* ECF No. 1 at 2; ECF No. 56 at 3); *see generally Terry v. June*, No. A.304cv00064, 2006 WL 736861, at *2-5 (W.D. Va. March 23, 2006); *Quilling v. Cristell*, No. A.304cv252, 2006 WL 316981, at *4 (W.D.N.C. Feb. 9, 2006). Nevertheless, for the reasons stated in *Terry v. Walker* and because the parties are in agreement on this point, the court is satisfied that it should apply South Carolina's choice of law rules. *See In re Merritt Dredging Co., Inc.*, 839 F.2d 203, 206 (4th Cir. 1988) ("Because no overwhelming federal policy requires us to formulate a choice of law rule as a matter of independent federal judgment, we adopt the choice of law rule of the forum state, South Carolina."); *see also* 19 Charles Alan Wright et al., *Federal Practice and Procedure* § 4520 (3d ed. 2016).

Defendant assumes, without citation to any authority, that, under South Carolina law, a fraudulent conveyance claim sounds in tort. (*See* ECF No. 71 at 7.) Defendant then points to the well-known South Carolina choice of law principles applicable to tort claims: for substantive law, *lex loci delicti*, meaning the law of the state where the injury occurred applies; for procedural law, *lex fori*, meaning the law of the forum (here, South Carolina) applies. *See Stern v. Shelley*, 781 F. Supp. 2d 281, 284 (D.S.C. 2011) (citing *Thornton v. Cessna Aircraft Co.*, 886 F.2d 85, 87 (4th Cir. 1989)). Citing non-South Carolina authorities, Defendant asserts that an injury occurs in the place where the last act necessary to make the defendant liable for the tort at issue occurs and that, for a claim of fraudulent conveyance, the last act giving rise to liability occurs when the transferee accepts the transferred property. (*See* ECF No. 71 at 7 (citing *Terry v. Walker*, 2006 WL 736861, at *6; Restatement (First) of Conflict of Laws § 377 (1934)).) Because the vast majority of checks Defendant received from AB&C were cashed or deposited in Florida, Defendant argues that Florida substantive law should apply to the fraudulent conveyance claim.

The Receiver asserts that South Carolina law should apply to the fraudulent conveyance claim. (*See* ECF No. 73 at 6.) The Receiver appears to assume for argument's sake that Defendant's premise—that, under South Carolina law, a claim for fraudulent conveyance claim sounds in tort and that the place of injury determines the substantive law to apply—is correct, and the Receiver never comes round to challenge that premise. (*See id.* at 7.) Instead, the Receiver points out that, under South Carolina law, the place where the injury occurred is defined not necessarily by reference to the place where the last act giving rise to liability occurs but, instead, by reference to the place "where the plaintiff, as a result of the [delict], suffered a loss." *Lister v. NationsBank of Del., N.A.*, 494 S.E.2d 449, 455 (S.C. Ct. App. 1997); (*see* ECF No. 73 at 7 (quoting *Lister*).) The Receiver argues that, in this case, he, standing in the shoes of AB&C suffered the loss at issue in South Carolina, "where the company was located and operated the Ponzi scheme on a daily basis," and that, therefore South Carolina substantive law applies. (ECF No. 73 at 7.)[6]

In deciding which state's law should apply to the adjudication of a claim, the characterization of that claim is determined by reference to the law of the forum. *See Colonial Life & Acc. Ins. Co. v. Hartford Fire Ins. Co.*, 358 F.3d 1306, 1309-10 (11th Cir. 2004); *Fahs v. Martin*, 224 F.2d 387, 396 (5th Cir. 1955); Restatement (First) of Conflict of Laws § 7. Here, then, South Carolina law determines how a fraudulent conveyance claim should be characterized for choice of law purposes. Whether a fraudulent conveyance claim should be characterized as a tort action is

---

[6] *But see Rogers v. Lee*, 777 S.E.2d 402, 405 (S.C. Ct. App. 2015) ("In *Lister*, the injury that occurred was the misappropriation of the plaintiffs' money and this injury was directly to their money, which occurred in South Carolina. In *Lister*, the injury was not considered to have occurred in South Carolina simply because the plaintiffs resided in South Carolina and therefore felt the financial consequences of it there. Rather, as noted by this court in *Lister*, 'South Carolina was the place where the money was wrongfully appropriated.'" (quoting *Lister* at 145, 494 S.E.2d at 456)).

uncertain and disputed among American jurisdictions. *See Sheehan v. Saoud*, 650 F. App'x 143, 154 (4th Cir. 2016); *MainStreet Bank v. Nat'l Excavating Corp.*, 791 F. Supp. 2d 520, 529 n.14 (E.D. Va. 2011); *Roanoke Cement Co., LLC v. Chesapeake Prods., Inc.*, No. 2:07cv97, 2007 WL 2071731, at *7 (E.D. Va. July 13, 2007); *Terry v. June*, 420 F. Supp. 2d 493, 502-03 (W.D. Va. 2006). Although Defendant assumes without support, and the Receiver assumes without acceding, that a fraudulent conveyance claim sounds in tort for purposes of South Carolina choice of law rules, no South Carolina court appears to have reached this conclusion, and the parties point to no decision that supports such a characterization. If South Carolina courts had not spoken on choice of law principles for fraudulent conveyance claims, the court might have embarked on a determination of whether South Carolina would view a fraudulent conveyance claim as one sounding in tort. *See Roanoke Cement*, 2007 WL 2071731, at *7. However, the South Carolina Supreme Court has addressed the choice of law rules to be applied when a court is confronted with a fraudulent conveyance claim in *Sheldon v. Blanvelt*, 7 S.E. 593 (S.C. 1888).[7]

In *Sheldon*, one Blanvelt, who was a New York citizen and domiciled there, transferred, by means of an assignment, some of his personal property to Asa Dicksinson, who represented certain of Blanvelt's creditors. *Id.* at 593. The assignment transferring the personal property was executed in New York. *Id.* The personal property that became the subject of the law suit was located in South Carolina at the time the assignment was executed. *Id.* at 593-94. The transfer provided for the payment of debts for wages and salaries that Blanvelt owed to his employees. *Id.* at 593. Under New York law, a preferential transfer to such creditors was permitted and, in fact, required. *Id.* Under South Carolina law, a preferential transfer to such creditors over others who

---

[7] Subsequent authorities have cited to this case using the case names *Sheldon v. Blauvelt* and *Ex Parte Dickenson. See Ayers v. Des Portes*, 35 S.E. 218, 219 (S.C. 1900); *Hughes v. Edisto Cypress Shingle Co.*, 28 S.E. 2 (S.C. 1897).

held priority was not permitted, and a statute expressly made assignment accomplishing such transfers null and void. *Id.* at 594. Blanvelt's other creditors, who presumably held priority over the employee-creditors, sued in South Carolina state court to avoid the assignment. *Id.* at 593. After failing in the trial court, the creditors appealed to the South Carolina Supreme Court.

The Supreme Court explained that "[t]he fundamental question . . . is as to the validity of the assignment . . . [and] whether it is sufficient to pass the title of property found in this state." *Id.* at 594. In a variety of ways, the Supreme Court explained that the law of New York would govern the validity of a transfer like the one presented to it, unless the application of New York law would result in a violation of the public policy of South Carolina:

> The general rule undoubtedly is that, in regard to all contracts of which the subject–matter is personal property, their validity is to be tested by the law of the place where the contract is made. If valid there, they will be sustained everywhere, upon principles of international or interstate comity. But to this rule there is a well–defined exception that, where the contract is in violation of established public policy of the state whose courts are called upon to enforce the contract, especially if it is in violation of some express statutory enactment of such state this rule of comity is no longer recognized or acted upon; and in such case the contract, though valid where made, cannot be enforced in the state in violation of whose laws it was made; for, . . . this principle of comity always yields when the laws and policy of the state where the property is located has prescribed a different rule of transfer from that of the state where the owner lives. . . . [A] transfer of personal property located in one state, by the owner in the state of his domicile, valid according to the laws of the latter state; but such was not the domicil, valid according to the laws of that state, but in violation of the laws of the state where the latter state, and that is the extent to which we go.

> . . . . The true rule, as we understand it, is that while, on principles of comity, the transfer or assignment of personal property located here, made by the owner in accordance with the laws of his domicile, will be recognized here, yet . . . [t]here is no comity which required us to give force to laws of another state which directly conflict with the laws of our own. . . . [A]n assignment of personal property for the benefit of creditors, made in accordance with the laws of the debtor's domicile, is good in the state where the property is actually located only in the absence of express enactment of such state to the contrary. Hence where, as in this case, it is sought to set up an assignment directly in conflict with our express statutory enactment, . . . we think it clear that no

> principles of comity require us to recognize such an assignment, even though
> it be in strict conformity with the law of the debtor's domicile.

*Id.* at 594-96 (internal quotation marks and citations omitted). The upshot of *Sheldon*, then, may be stated so: unless doing so would violate the forum's public policy, the validity of a preferential transfer of personal property located within the forum by an assignment that is executed outside the forum by a party domiciled outside the forum is not governed by the law of the forum.

*Sheldon*, despite its age, is still the law of South Carolina that appears to govern choice of law for fraudulent conveyance and preferential assignment claims, and this court must follow its ruling. *See Klaxon*, 313 U.S. at 496-97 (1941). Nevertheless, eliciting a straightforward choice of law rule applicable to similar cases has proved difficult. There are three interpretations of *Sheldon*'s holding that can be distilled from subsequent case law and secondary sources. First, some authorities interpret *Sheldon*'s choice of law rule to turn on where the assignment transferring the personal property is executed, and thus conclude that South Carolina would apply the law of state where such assignment was executed. *See* 17A William Meade Fletcher et al., *Fletcher Cyclopedia of the Law of Corporations* § 8548 (perm. ed., rev. vol. 1999 & 2016 update); 111 A.L.R. 787, parts iii.b.1-2 (Orig. Pub. 1937); 2 Harvard L. Rev. 386, 386 (March 15, 1889). Other authorities seem to interpret *Sheldon*'s choice of law rule to direct the application of the law of the state where the assignor or transferor is domiciled. *See Adams v. Fellers*, 70 S.E. 722 (S.C. 1911); *Ayers v. Des Portes*, 35 S.E. 218, 218 (S.C. 1900); 111 A.L.R. 787, *supra*. Still other authorities interpret *Sheldon* as applying the law of the *situs* of the personal property. *See Adams*, 70 S.E. 722; *Ayers*, 35 S.E. at 218; 111 A.L.R. 787, *supra*. Of course, all of the authorities agree that, whatever general choice of law principle should be drawn from *Sheldon*, it remains subject to the traditional exception applying South Carolina law where following the law of a foreign forum would be repugnant to South Carolina public policy. Though there may be a good deal of uncertainty as to

the precise choice of law principle to be drawn from *Sheldon*, it seems clear that *Sheldon* does not

adopt the view of the parties that a fraudulent transfer claim is essentially a tort and that the law to

be applied is the law of the state where the harm occurs. Under *Sheldon*, *lex loci delicti* does not

apply to fraudulent transfers.

Although the court's review of *Sheldon* helps clarify what choice of law rule should not be

applied here, it does not directly answer which law—South Carolina's or Florida's—should apply

to the instant fraudulent conveyance claim. The court notes in this regard that, unlike in *Sheldon*,

the transferor in the instant action (AB&C) was domiciled in South Carolina at the time of the

transfers. The court also notes that, although it appears undisputed that all transfers from AB&C

to Defendant were completed in Florida when Defendant deposited or cashed checks he received

from AB&C there, it is not clear whether the completion of a transfer is equivalent to an execution

of an assignment for purposes of deciding choice of law issues for a fraudulent conveyance claim,

and for similar reasons it is not clear where the assets were located at the time of transfer. The

differences between the facts in *Sheldon* and the facts of this case, therefore, may require here a

choice of law ruling different from that in *Sheldon*. In any event, because *Sheldon* only clearly

applies when the transferor is domiciled outside South Carolina and transfers personal property by

an assignment executed outside of South Carolina, *Sheldon* does not appear to control here.

The South Carolina Appellate Court Rules provide that the South Carolina Supreme Court

> in its discretion may answer questions of law certified to it by any federal court
> of the United States . . . when requested by the certifying court if there are
> involved in any proceeding before that court questions of law of this state
> which may be determinative of the cause then pending in the certifying court
> when it appears to the certifying court there is no controlling precedent in the
> decisions of the Supreme Court.

S.C. App. Ct. R. 244(a).

In the court's view, the question of which law should apply to the Receiver's fraudulent conveyance claim under South Carolina choice of law rules is a question of South Carolina state law that may be determinative of the fraudulent conveyance claim pending in this matter, and it appears that there is no controlling precedent on the question in the Supreme Court's decisions. Accordingly, the court intends to certify a question of law on the issue to the Supreme Court.

## C. Unjust enrichment

Defendant asserts that, under South Carolina choice of law rules, the Receiver's unjust enrichment claim is governed by Florida law. (*See* ECF No. 71 at 7-8; ECF No. 74 at 4; ECF No. 77 at 4-5.) He posits two reasons for his assertion. First, he argues that choice of law for unjust enrichment claims is decided by the five-factor "most significant relationship test" found in Restatement (Second) of Conflict of Laws § 221 (1971). (*See* ECF No. 71 at 7-8 (citing *Hadidi v. Intracoastal Land Sales, Inc.*, No. 4:12-cv-535-RBH, 2014 WL 2881875 (D.S.C. June 25, 2014)); ECF No. 77 at 4-5 (same).) In applying the test, Defendant argues that Florida has the most significant relationship to the transactions giving rise to the claim because the act conferring the allegedly unjust benefit was completed in Florida when Defendant deposited or cashed checks from AB&C there, because Defendant received account statements in Florida, because Defendant requested withdrawals from outside South Carolina, and because Defendant is a resident of Florida. (*See* ECF No. 71 at 8; ECF No. 77 at 5.) Second, in his response to the Receiver's summary judgment motion, without explaining why the most significant relationship test should now be jettisoned, Defendant presumes, without citation to any authority that the unjust enrichment claim sounds in tort and, again without citation to any authority, argues that the normal choice of law rule, *lex loci delicti* for substantive law, applies to the unjust enrichment claim. (*See* ECF No. 74

at 4.) Defendant argues that, because he deposited checks from AB&C in Florida, the harm at issue occurred in Florida, and the substantive law of Florida should apply. (*See id.*)

The Receiver asserts that South Carolina substantive law governs his unjust enrichment claim. (*See* ECF No. 73 at 6, 8-9; *see also* ECF No. 70 at 10-12 (applying only South Carolina law).) The Receiver appears to accept that the Restatement's most significant relationship test determines which law should apply (*See* ECF No. 73 at 8 (citing *Hadidi*).) In the Receiver's view, however, South Carolina has the most significant relationship to the transactions giving rise to the claim because the parties entered into the relationship in South Carolina, the Ponzi scheme was commenced and orchestrated in South Carolina, Wilson and Defendant met in South Carolina and began a relationship centered on the silver investment at issue, the two maintained their relationship by meeting in South Carolina, the fraudulent account statements were created in South Carolina, and the act of conferring the allegedly unjust benefit occurred in South Carolina because all the checks sent to Defendant were executed and sent from South Carolina. (*Id.* at 8-9.)

The court is not persuaded by either party's argument. As an initial matter, the court concludes that the most significant relationship test found in the modern Restatement has not been adopted by South Carolina courts and is inapplicable here. Although both parties cite to *Hadidi* for the proposition that South Carolina would employ the most significant relationship test to a claim for unjust enrichment, *Hadidi* is inapposite. In that case, the original action had been filed in New Jersey state court before being removed to the federal district court in New Jersey and then transferred, pursuant to 28 U.S.C. § 1404(a), to the federal district court in South Carolina. *See* 2017 WL 2881875, at *1, *3-4. The district court in South Carolina explained that "the transferee court must follow the choice-of-law rules that prevailed in the transferor court" and therefore determined that it must employ New Jersey's choice of law rules rather than South Carolina's

31

choice of law rules. *Id.* at *4 (citing *Van Dusen v. Barrack*, 376 U.S. 612 (1964)). New Jersey has adopted the modern Restatement's most significant relationship test, *see id.* (citing *P.V. v. Camp Jaycee*, 962 A.2d 453, 455 (N.J. 2008)), and that is the only reason the *Hadidi* court employed it. The parties do not cite any South Carolina court decision adopting the test, and the court has unearthed no authority whatsoever supporting the proposition that South Carolina has adopted the test. In fact, the South Carolina Court of Appeals has expressly stated that "South Carolina has not adopted the modern choice of law test found in the Restatement," *Lister*, 494 S.E. 2d at 456, and any application of the most significant relationship test by a South Carolina court has been preceded by the statement that the result of the court's choice of law analysis would be no different *if* it employed that test, *see id.*; *Unisun Ins. Co. v. Hertz Rental Corp.*, 436 S.E.2d 182, 184 n.1 (S.C. Ct. App. 1993). In short, South Carolina does not use the most significant relationship test, and the parties' arguments regarding its application here will be ignored.

The only other argument from the parties regarding South Carolina's choice of law rules for unjust enrichment claims, advanced only by Defendant, is that that unjust enrichment is essentially a tort and, therefore, the choice of law rules applicable for tort claims apply to unjust enrichment claims. Unfortunately, Defendant's argument is devoid of any citation to supporting authority. That is not surprising, as the court's own research has uncovered no support in South Carolina case law for the proposition that South Carolina law would treat an unjust enrichment claim as a tort for purposes of choice of law analysis. In fact the court has located only three authorities that touch upon the issue, and all of them are decisions by federal courts.[8]

---

[8] The court notes that, in South Carolina law, the terms contract implied-in-law, quantum meruit, quasi-contract, restitution, and unjust enrichment have often been used interchangeably to refer to the same type of claim for equitable relief. *See Gignilliat v. Gignilliat, Savitz & Bettis, L.L.P.*, 684 S.E.2d 756, 764 (S.C. 2009); *Williams Carpet Contractors, Inc. v. Skelly*, 734 S.E.2d 177, 180

An 1888 decision suggests that, where an express contract for an agent's compensation is absent, the law of the state where the agency was accepted and performed should apply to a claim seeking compensation. *See Martin v. Roberts*, 36 F. 217, 219 (C.D.S.C. 1888). The persuasiveness of *Martin* is doubtful because it is unclear whether the *lex loci contractu* rule that it incorporates was applied because the claim at issue was one for an implied-in-fact contract rather than an implied-in-law contract, *see Myrtle Beach Hosp., Inc. v. City of Myrtle Beach*, 532 S.E.2d 868, 872 (S.C. 2000) (distinguishing the two claims), and more importantly because the decision predates *Erie R. Co. v. Tompkins*, 304 U.S. 64 (1938) (requiring federal district courts to apply law of the states in which they are situated), and thus is unlikely to reflect South Carolina choice of law rules.

In a more recent case, *Joye v. Heuer*, 813 F. Supp. 1171 (D.S.C. 1993), the district court was faced with a claim between attorneys in South Carolina and an attorney in California. 813 F. Supp. at 1172-73. The South Carolina attorneys alleged that they entered into an oral contract with the California attorney, in which the California attorney would undertake to represent in California court a client of the South Carolina attorneys, and the attorneys would split any fee if the California attorney succeeded in a California law suit on behalf of the client. *Id.* The South Carolina attorneys also asserted, in the alternative, a claim for quantum meriut in the event they did not succeed on their contract claim. *Id.* at 1173-74. In analyzing choice of law rules for the contract claim, the court applied South Carolina's *lex loci contractu* rule, and determined that California law governed the question whether the contract existed. *Id.* at 1173. After finding that the contract existed, the court determined that it was valid and entered judgment in favor of the South Carolina attorneys

---

(S.C. Ct. App. 2012); *QHG of Lake City, Inc. v. McCutcheon*, 600 S.E.2d 105, 108 (S.C. Ct. App. 2004).

on their contract claim. *Id.* at 1173-75. The court next addressed the quantum meruit claim and determined, without any choice of law analysis, that California law also governed that claim. *Id.* at 1174. The court determined that, in the event its decision to grant judgment in favor of the South Carolina attorneys' contract claim was overturned on appeal, it would enter judgment in their favor on the quantum meruit claim as well. *Id.* at 1174-75.

In this court's view, the *Joye* decision is of little aid to the choice of law issue confronted here. First, as in the *Martin* case, it is not clear whether the *Joye* court viewed the quantum meruit claim as a legal one, such as an implied-in-fact contract claim, or as an equitable one, such as an implied-in-law contract claim; and, if the court viewed the claim as one asserting an implied-in-fact contract, it is not clear what bearing the case has on the choice of law rules to be applied to an equitable claim of unjust enrichment. In this regard, the court notes that *Joye* was decided during a time when a good deal of confusion surrounded the distinction between legal and equitable claims of this nature. *See Myrtle Beach*, 532 S.E.2d at 872. More importantly, the decision is devoid of any explanation as to why California law applied to the quantum meruit claim. For these reasons, the court believes that *Joye* is of limited value in deciding the issue confronting the court here.

The last case touching upon South Carolina choice of law rules for an unjust enrichment claim is found in *Gentry Tech. of S.C., Inc. v. Baptist Health S. Fla., Inc.*, No. 1:14-cv-02127-JMC, 2016 WL 403879 (D.S.C. Feb. 3, 2016). In making its choice of law decision, the *Gentry* court noted the South Carolina rules applicable to tort claims—for substantive issues, the law of the state where the injury occurred governs; for procedural issues, the law of the forum governs—and the South Carolina rules applicable to contract—for issues of formation, interpretation, or validity, the law of the state where the contract was formed governs; for issues of performance,

the law of the state where performance is to occur applies. *See Gentry*, 2016 WL 403879, at *4

(citing *Thornton v. Cessna Aircraft Co.*, 886 F.2d 85, 87 (4th Cir. 1989); *Witt v. Am. Trucking Ass'ns., Inc.*, 860 F. Supp. 295, 300 (D.S.C. 1994)). Without any further explanation, the court

ruled that "Florida's substantive law is applicable to [the] claim for unjust enrichment." *Id.*

In this court's view, the *Gentry* decision is also of little aid. The reasons for the truncated

choice of law analysis in *Gentry* become clearer upon closer inspection. First, it appears that the

parties did not dispute that Florida substantive law governed the unjust enrichment claim. The

defendant expressly offered a view on all fours with the position subsequently taken by the court,

*see id.*, at *3 n.4, and the plaintiff's arguments, as summarized by the court, appear to accede to

the defendant's view, *see id.*, at *4. Adverse parties' express or implicit agreement as to what law

governs particular issues between them provides a valid basis for the court to apply that law, *see*

*Companion Prop. & Cas. Ins. Co. v. U.S. Bank Nat'l Ass'n*, No. 3:15-cv-01300-JMC, 2016 WL

6525478, at *9 n.5 (D.S.C. Nov. 3, 2016) (citing, *inter alia*, *Cosey v. Prudential Life Ins. Co.*, 735

F.3d 161, 169 n.7 (4th Cir. 2013)), and, thus, the *Gentry* court had no reason to apply any

substantive law other that of Florida. Here, on the other hand, the parties sharply disagree as to the

law that should apply to the Receiver's unjust enrichment claim.

Second, it appears that the *Gentry* court accepted the parties' express or implied arguments

that the unjust enrichment claim necessarily falls under the choice of law rules applicable to either

tort claims or contract claims, *see Gentry*, 2016 WL 403879, at *3 n.4, and then drew the logical

conclusion that, because all events of consequence occurred in Florida, the choice of law rules

applicable to tort and contract claims both pointed toward Florida substantive law. The view that,

so long as both contract and tort choice of law principles point toward the same law, the court may

apply that law is not without some support. *See Yeager v. Md. Cas. Co.*, 868 F. Supp. 141, 143

(D.S.C. 1994) ("South Carolina's choice of law principles generally have turned on whether the principal claim is characterized as one in contract or tort."). However, this court is not persuaded that such a principle should apply here. As the discussion in the previous section regarding choice of law rules for fraudulent conveyance claims amply demonstrates, the analysis does not always boil down to a neat determination of whether the claim sounds more in tort or more in contract. Further, unlike in *Gentry*, the instant case is not one in which all signs point to Florida or to South Carolina. Here, activities necessary to the completion of the transfers at issue took place in both Florida and South Carolina, and the parties have been sure to point out these activities.

Third, as in *Joye*, the court in *Gentry* did not offer much in the way of explanation for its decision to apply Florida law to the unjust enrichment claim. Although it appears to have been occasioned by the parties' agreement and the obviousness of the result, the brevity of the *Gentry* court's analysis cautions against viewing it as very useful here.

As authority on South Carolina choice of law rules with respect to an unjust enrichment claim is even scarcer than it is with respect to a fraudulent conveyance claim, the court has no trouble concluding that it should certify to the South Carolina Supreme Court a question as to the choice of law rules to be applied in such circumstances. More specifically, in the court's view, the question of which law should apply to the Receiver's unjust enrichment claim under South Carolina choice of law rules is a question of South Carolina state law that may be determinative of the unjust enrichment claim pending in this matter, and it appears that there is no controlling precedent on the question in the Supreme Court's decisions. Accordingly, the court intends to certify a question of law on the issue to the Supreme Court.

## IV. CONCLUSION

For the foregoing reasons, Defendant's motion for summary judgment (ECF No. 71) is hereby **DENIED IN PART** with respect to the seven issues raised therein as set out more fully in the order above. By a separate order that complies with the requirements of Rule 244, the court will certify to the South Carolina Supreme Court the questions of law regarding South Carolina choice of law rules for fraudulent conveyance and unjust enrichment claims as set out more fully in the order above.[9] The court will reserve its decision on the Receiver's motion for summary judgment and on the portions of Defendant's motion for summary judgment that have not been disposed by this order.

**IT IS SO ORDERED**.

J. Michelle Childs

United States District Court Judge

July 5, 2017
Columbia, South Carolina

---

[9] Because the parties' briefing on the choice of law issues overlooked much of the court's analysis and because the parties do not appear to have contemplated certification regarding the issues, before entering the certification order, the court might seek the parties' input by directing briefing on the form of the questions to be certified. The court notes here, however, that such an order would not be an invitation to seek certification of other questions. The court also expressly states here that nothing in this order prevents the parties from stipulating or otherwise reaching agreement on the law to be applied to the Receiver's claims prior to the entry of the certification order. Once the certification order is entered, however, the court would likely stay the proceedings in this matter, and the parties will be unable to avoid adjudicating the issues in the Supreme Court.